I. N. BISTLINE, Appellant, v. MRS. PETER KOEP et al., Appellees.

**VENDOR AND PURCHASER:** Insufficient Evidence of Contract. Evidence held wholly insufficient to establish an oral contract for the sale of real estate, with part payment made.

*Appeal from Benton District Court.*—JAMES W. WILLETT, Judge.

DECEMBER 13, 1921.

ACTION to recover damages for claimed breach of a verbal contract between appellees and appellant to sell appellant a farm of 160 acres and 10 acres of timber land remote from the farm. At the close of the testimony of plaintiff, on motion of defendants, the court directed a verdict. Judgment was entered on the verdict, from which plaintiff appeals.—*Affirmed.*

*Snyder & Snyder* and *Hugh Mossman,* for appellant.

*W. C. Scrimgeour* and *Tobin, Tobin & Tobin,* for appellees.

ARTHUR, J.—Plaintiff had leased from Peter Koep the quarter section of land involved, and was, at the time of the alleged contract of purchase, occupying it as a tenant. Plaintiff was not a lessee of the 10-acre timber tract. Peter Koep died before the alleged contract of purchase, owning the land in controversy, and left surviving his widow, Dora Koep, who is "Mrs. Peter Koep," appellee, Claus Koep, Katie Koep Jacobs, married to

John C. Jacobs, Louis Koep, married to Amelia Koep, and Dora Scheetz, single, and Mary Koep, single, who became the owners of the land, the widow owning an undivided one-third interest, and the children each an undivided two-fifteenths interest. .

The only evidence offered to prove the claimed verbal contract for the purchase of the 170 acres of land was the testimony of plaintiff himself. The question presented is of fact.

Plaintiff had no talk whatever concerning the purchase of the land with any of the six owners, except the two appellees the widow, Dora Koep, and one of the single daughters, Mary Koep, who seemed to have been living together, apart from the other owners. The first conversation between the parties was in the latter part of March or 1st of April, 1919, when plaintiff went to the home of the widow and daughter, who lived in Belle Plaine, to see about some wire fence on the farm. At that time, the plaintiff asked defendants if he might rent the farm again, and they told him he might, if they did not sell it; that it was for sale; and that he better buy it. Plaintiff said he had not thought about buying the farm. He asked them what their price was, and they told him that a man had offered $235 an acre, if he could sell his land. Again, about April 15, 1919, plaintiff went to the home of defendants, to take them a load of cobs. He says:

"They wanted to sell the farm again, and wanted to know if I didn't want to buy the farm, and I told them I had kind of got cold feet, and Mrs. Koep said that it would warm up, some of these days."

The third conversation occurred on April 29, 1919, when plaintiff went to see the widow on an errand. As he says, "I went there to tell them about the well caving in." Plaintiff testified:

"When I was there on that occasion, they wanted to sell the farm again. They wanted to know if I would buy it. I told them I never did gamble, but I would just bite off a chunk; and I told them I would give them $500 down, a check for it, and $1,500 the 1st of May or thereabouts, and $10,000 next spring, the 1st of March, 1920. I gave Mary Koep my check book, and I told her she was a better writer than I was, and she filled out the check, and I signed it and tore it out and handed it to her,

and she took it.  When I paid the $500, I told them I would bring $1,500 more the 1st of May; then we would have a contract.  I wanted a contract written up.''

Bistline further testified that they talked about his buying the 10-acre timber tract along with the farm; that he did not know much about the timber tract; did not know anything about the lines or anything; but that he told them he would take the timber tract, provided they would place the purchase price indebtedness for it on the farm land; that he wanted the timber tract clear of incumbrance, so that he could sell it.

Bistline's proposition seems to have been to place the purchase price of the timber tract as an incumbrance on the farm, so as to not mortgage the timber tract, and he says the two women agreed to sell that way.  Bistline was asked this question:

''Q.  So that what you expected to do, when you reached an understanding and agreement with these people, was that you were going to have a written contract fixed up by your lawyer,— is that right?  A.  Yes.''

And the further question:

''And in that written contract you expected to have placed the terms and conditions of the purchase, if they were signed up, didn't you?  A.  Yes.''

This conversation, of April 29th, is the one on which plaintiff bases his contract.

The next talk occurred on May 2d, when Bistline went to pay $1,500, which payment, he says, he was to make on or about. May 1st.  He did not tender $1,500 in money or by check, or in any manner.  The record shows that Bistline had money on deposit in the bank sufficient to take care of the $500 check, and also a $1,500 check.  Bistline says:

''They said the heirs would 'not sign on account of that timber deal; it wouldn't be right, putting part of the timber onto the farm.''

Bistline said that there was talk about a written contract, in the conversation on May 2d, and that he wanted a contract. When asked what he wanted a written contract for then, after he claimed to have bought the land, he answered:

''Well, in regard to the different payments, and to show that when it was to be paid, and so forth.''

Asked further what else he wanted in the written contract, other than the times of payment, he answered, "Well, I don't know. I was going to leave that to the attorney to fix up." Asked if, in the written contract, he expected to have placed the terms and conditions of the purchase, if the Koeps would sign, he answered, "Well, yes, I suppose." He said Mary told him that the children would not sign the contract on account of the timber deal, and that he told her that, "if that made any material difference, they could just call it as it was." Bistline further testified:

"When I went away that day, I supposed there would not be any contract signed by the children; they told me so. It was on account of that timber deal that they wouldn't sign. I told them they could call it $236 an acre for the land, then $75 for the timber land, if that made any more money. When I went away, they said the children would not sign any contract with me."

At this conversation on May 2d, Bistline says:

"Mary got the check and laid it down on the table in the kitchen * * * and I just kind of picked it up and laid it down. I played with it during the conversation. I left it lying there. I didn't take it."

Bistline says that the Koeps told him to take the check,— that it was his; and that he got up and went out, without saying anything further; that, when he was going out, Mary tried to put the check in his pocket, and it fell to the floor; and that she followed him out into the yard, and said, "Here is your check,— we don't want it, and there it lies on the ground, and I won't pick it up;" that he didn't pick the check up; that, when he left, the check was lying on the ground in the yard; that the check was never cashed.

A day or two later, Bistline met Louis Koep, and told him that he had paid $500 down and had gone back with $1,500, and that they would not take it; and he wanted Louis to intercede in securing the contract for him. Bistline says that, when he went to pay the $1,500, he "supposed when they took the money they would make the contract. I went there that day with the expectation of having it." Bistline had stopped at a bank, to get a contract blank, and the banker told him that he had bet-

ter go to an attorney; and he then went to the office of an attorney, to see about making out a contract.

About the last of May, Bistline took C. W. E. Snyder, a member of the firm of Snyder & Snyder, attorneys, with him to the home of Mrs. Koep and her daughter. Bistline testified that Snyder telephoned him to come into town, as he thought he could get things fixed up, and that, when he arrived at the Snyder office, Snyder said:

"Take the contract along, and we would go up." Bistline said:

"It was our object, in going up to the house that afternoon, to get a contract. Mr. Snyder and I went up to Mrs. Koep's that day to see if we could get a contract. Snyder said to the Koeps 'We came up to fix that contract.' The women said they would not sell the farm now at all. Mr. Snyder said to the women, 'Now we have come up to see if we can fix up this contract.' "

When asked if he and Snyder were there to try to get a contract from the women for the farm and the 10-acre timber tract, Bistline answered: "Not for the 10 acres,—for the farm."

Bistline was recalled by his counsel, and this interrogatory was propounded to him:

"Now, Mr. Bistline, in this conversation that you testified about on April 29th, wherein you agreed to pay $500 cash and $1,500 May 1st, and $10,000 on March 1, 1920, I will ask you to refresh your recollection and state whether or not there was any further conversation about any further settlement for the land."

Bistline answered:

"Yes, I was to pay $10,000 this spring, March 1st, and then take over the farm; and the rest, give a mortgage on the farm at 5 per cent for 10 years."

C. W. E. Snyder testified as to what took place when he visited the Koeps with his client, Bistline. Snyder introduced the subject by telling them that he understood that Bistline wanted to fix up on any terms that were satisfactory to them, and they told Snyder that they did not have any contract with Bistline. He said to Mary, "Didn't Mr. Bistline give you a check for $500?" and she said, "Yes, but we haven't got that check; he took it back." Snyder then turned to Bistline and

asked him if he took the check back, and Bistline said: "No, they tried to get it to me, and tried to put it in my pocket, but I wouldn't take it." Snyder testified that they were there five or ten minutes, and Snyder said, "We might as well be going; we can't do anything with them."

Snyder had a conversation with the Koeps over the telephone, before he called Bistline, in which he told them that he was representing Bistline, and referred to their refusal to sell Bistline the property, and suggested that he understood that they were objecting because the 10-acre timber patch had not been put into the mortgage; and said that he thought Bistline was willing to put that in, if they insisted on it, and that he would be glad to help them fix the matter up, if he could. Snyder testified that Mary said: "We didn't have any contract with Bistline, and he took the check back."

Objections were sustained to some questions asked Bistline by his counsel, which ruling appellant assigns as error. We need not set out the questions. They clearly called for mere conclusions, and if answered as anticipated by plaintiff, would not affect the result.

It is manifest that the widow and daughter had no authority to sell the land, other than their own undivided interests therein, which plaintiff does not claim was his bargain; and that they did not pretend nor assume that they did have authority to make a bargain for and to sell the land; that Bistline knew how the land was owned; that he had leased the land from the ancestor, Peter Koep, and knew that Peter Koep owned the land; that he knew of the death of Peter Koep, and knew the members of the family; that he did not attempt to deal with the four other owners.

At most, the evidence shows only that Bistline was negotiating with these two women for the property, and that they never came to an agreement. Their minds never met on the essential elements of a contract for the purchase of the real estate. Bistline's testimony indicates that all the talks between him and the two women were vague, indefinite, preliminary talks, with the view, perhaps, on the part of both parties of finally agreeing upon terms, and then entering into a contract which would be in writing. Bistline did hand the women a

check for $500. When Bistline returned, in a few days, the women attempted to return the check to him. According to Bistline's testimony, the women claimed that they did return the check to him. Bistline claims that they did not. The check was finally left lying out in the yard. According to Bistline, he was to make a $1,500 payment, which he says he went to the Koep home prepared to make. He did not offer money or check to them, but was not in default for want of tender; for the women told him they would not deal with him. Damages are claimed for breach of contract to sell 170 acres of land,—the farm of 160 acres and the 10-acre timber tract. Bistline, in his testimony, does not pretend to say that any terms were finally agreed upon as to the timber tract. In fact, it is practically conceded that no agreement was reached as to the timber tract. Snyder, attorney, recognized that situation, evidently, from his talk with Bistline, and proposed to waive any deal as to the timber tract.

We think it cannot be ascertained from Bistline's testimony how much an acre he was to pay for the land,—that is, how much for the farm land and how much for the timber land; or if he bought it in bulk, how much he was to pay for all the land. It appears that Bistline talked about paying $500 down and $1,500 on or about May 1st, and $10,000 in the following spring; but it does not appear how and when and where he was to pay the remaining more than $26,000. Concerning this large deferred payment, nearly the entire purchase price, Bistline makes the vague, indefinite statement that he was to "pay $10,000 in the spring, and then take over the farm; and the rest, give a mortgage on the farm at 5 per cent for 10 years." While some propositions were made by Bistline, which he says were accepted, it does not appear just what Bistline agreed to pay, nor what the women agreed to do. Nothing is said about giving possession, nor as to when conveyance was to be made, nor about what kind of conveyance, nor anything about who was to join in the conveyance with these two women, who owned less than one half of the undivided interests in the land. Nothing was said about taxes or insurance or abstract of title. The evidence falls far short of establishing a contract between plaintiff and defendants, even if defendants had had authority to sell the interests of all the owners in the land.

It is unnecessary to discuss other questions. The motion for directed verdict set out sufficient grounds, and there was no error in sustaining it. The judgment of the court below is affirmed.—*Affirmed.*

EVANS, C. J., STEVENS and FAVILLE, JJ., concur.